UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT LEXINGTON**

| | | |
|---|---|---|
| HENRY BECK LIVINGSTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-CV-414-JMH |
| | ) | |
| vs. | ) | |
| | ) | |
| DR. RONALD EVERSON, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

**** **** **** ****

Plaintiff Henry Beck Livingston is an inmate formerly incarcerated at the Blackburn Correctional Complex ("BCC") in Lexington, Kentucky, who has recently been transferred to the Kentucky State Reformatory ("KSR") in LaGrange, Kentucky.  While an inmate at BCC, Livingston, proceeding without counsel, filed an Emergency Affidavit [R. 1], which the Court construed as a civil rights action filed pursuant to 42 U.S.C. § 1983.  In his affidavit, Livingston contended that the defendants had acted with deliberate indifference to his serious medical needs, including treatment for obesity, cardiomyopathy, Hodgkins lymphoma, and chronic back pain, and he sought injunctive relief to obtain medical care.  [R. 1 at 3]

Livingston subsequently filed a "Motion of Supplement of New Evidence and Request for Order of Protection," in which he alleged that the defendants had retaliated against him for filing his complaint.  He stated that he was in fear of further retaliation and requested an emergency hearing and a preliminary injunction/protective order to prevent further retaliation.  [R. 7]

The Court screened his civil rights complaints pursuant to 28 U.S.C. § 1915A, and issued summons to BCC Warden Don Bottom, directing that a response be filed to Livingston's complaint

and his motion for a injunctive relief.  Warden Bottom has filed a response and moved to dismiss the complaint and to deny the motion for injunctive relief.  [R. 16]  Livingston has responded to the Warden's motion [R. 19, 20] and the warden has filed a reply in further support of his motion. [R. 25]  Having reviewed the submissions of the parties, the Court will dismiss Livingston's complaint and deny his motions for injunctive relief.

## FACTUAL BACKGROUND

Livingston, a former world-class weightlifter, has had a plethora of medical/health issues. On June 1, 2005, Dr. Geetha Bhat, Ph.D., M.D., a Professor of Medicine at the University of Louisville and Director of the Heart Failure and Cardiac Transplant Center, evaluated Livingston for a possible heart transplant.  Dr. Bhat noted that his past medical history includes nonischemic cardiomyopathy in March 2004; chronic obstructive pulmonary disease ("COPD"); hypertension; diabetes mellitus; chronic renal insufficiency; prostate hyperthrophy; prior history of deep venous thrombosis with pulmonary embolism; prior history of cardiac arrest; history of Hodgkin's lymphoma; obstructive sleep apnea; and frequent upper respiratory tract infections with current complaint of bronchitis and nasal congestion.  [R. 1-1 at 2, 4]  Dr. Bhat concluded that Livingston was not a candidate for a heart transplant because he was morbidly obese, weighing 437 pounds. [R. 1-1 at 2]  Dr. Bhat's report states, in part:

> . . .  At the present time, the patient's weight is prohibitively high for a transplantation.  At this time, we would recommend referral for gastric bypass surgery.  We will refer the patient to Dr. Gerald Larson at University Surgical Services for further evaluation regarding this.  The patient is currently on an excellent medical regimen, and would recommend continuing on with this regiment with particular attention at this time on improved blood pressure control.  We will refer the patient to Dr. McConnell to re-evaluate the patient regarding his obstructive sleep apnea, and for possible C-PAP.  Would recommend gastric bypass evaluation after the patient's pulmonary status has been optimized.

2

*Id.*

After this report was issued, Livingston received a pacemaker for his heart; has had bilateral knee arthroscopies; and has had gastric bypass surgery. [R. 1-3 at 9] By December 17, 2009, Livingston's weight had dropped from 437 to 357 pounds. [R. 1-3 at 10] As of July 12, 2012, his weight had dropped to 302 pounds. [R. 28-8 at 1]

# I

Livingston claims that he needs knee replacement surgery so that he can become more physically active, lose more weight, and become a viable candidate for a heart transplant. He contends that prison officials, by refusing to approve him for a medical furlough so that he can have knee replacement surgery at his own expense, have been deliberately indifferent to his serious medical needs. Livingston requests that the Court enter an injunction compelling the Kentucky Department of Corrections ("KDOC") to either provide the knee replacement surgery for him or to place him on medical furlough so he can obtain the surgery at his own expense.

A plaintiff bears the burden of establishing that he is entitled to a preliminary injunction. *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."); *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) ("[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion.").

In addressing a motion for a preliminary injunction, a court should consider: (1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial

3

harm to others; and (4) whether the public interest will be advanced by issuing the injunction. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573. Notwithstanding this balancing approach, however, the likelihood of success and irreparable harm factors predominate the preliminary injunction inquiry. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. National Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

In order to demonstrate that he is likely to succeed on the merits, Livingston must provide evidence strongly tending to prove that the failure to render the medical care he is requesting amounts to "cruel and unusual punishment" in violation of the Eighth Amendment. To do so, he must establish that prison medical staff acted with "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). This is a knowing, culpable state of mind which is shown only where the prisoner's health care provider demonstrates an intentional disregard for an excessive risk of harm to the inmate, such as by intentionally preventing the inmate from receiving prescribed treatment or intentionally delaying him access to needed medical care. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

To support his request for injunctive relief, Livingston has provided medical records which document his health issues dating back to 2004, including letters from physicians which indicate obesity and significant heart problems in March 2004. To support his claim that the defendants have acted with deliberate indifference in addressing his medical issues, Livingston places primary reliance upon the report of Dr. Kevin Pearce, a family practice physician who examined him in October 2010. Dr. Pearce opined that Livingston should have knee replacement surgery; however,

4

it is unclear from his report if he performed a knee examination.  Dr. Pearce's report states, in

relevant part, that:

> He is at increased risk of death from his underlying medical problems due to
> immobility caused by [degenerative joint disease] of the knees.
>
> He needs either a medical furlough or community-custody for definitive surgical
> [treatment] of his knees with concurrent medical consultation and management of his
> chronic medical problems perioperatively, under his own insurance, if necessary.

[R. 1-6 at 1]

Prior to Dr. Pearce's examination, Dr. Navin Kilambi of Orthopaedic Associates/Jewish

Physician Group evaluated Livingston on December 17, 2009.  [R. 1-3 at 9-10]  His report

documents Livingston's knee problems and suggests possible treatment options.  The "Plan" section

of Dr. Kilambi's report states:

> **PLAN**: I have counseled the patient that he is at a high risk for any invasive
> procedure.  He understands that.  I would recommend we get an MRI to look for
> loose body or recurrent tear of the meniscus and if that is the case we could consider
> arthroscopy understanding *there is a significant risk for major complications with
> this patient including death*.  He is very adamant about seeking arthroscopic care if
> at all possible and really relates he does not care about the level of the risk because
> he feels like he is in peak position as he can right now medically to get this done and
> he has been evaluated by his cardiologist and "cleared" to try to proceed with an
> arthroscopy.  Thus, we will proceed with a CT scan arthrogram CT, which may not
> give us much information as the MRI, but since he does have a pacemaker, this
> should give best information and depending on the nature of that we will decide
> treatment options, arthroscopic versus injectable, *but he is going to have some
> findings of significance for me to proceed with an arthroscopy with these risks*.

*Id.* at 10.  (emphasis added).  Livingston had a CT arthrogram, and Dr. Kilambi examined him again

on December 31, 2009, and injected his knee with an anti-inflammatory steroid for pain relief.  The

"Plan" section of that report states:

> **PLAN**: Thus, it is very difficult to ascertain if arthroscopy will help him.  So initially
> we are going to put him on some Voltaren again which he has taken in the past, 5 to
> 7 days cycles and then rest his stomach a little bit because he does take Prilosec

> because of irritability in his GI tract.  We will also inject the knee today with anti-inflammatory steroid to see if we can get some temporary relief, he had that a couple of months ago, and with this combination we are going to see if we can cool it down.  If he continues to have mechanical symptoms or no pain relief, we will have to consider arthroscopic surgery *understanding that there is a high risk for this patient* with multiple medical problems, but we are going to try and stop these mechanical symptoms.  He understands that *in the long term* knee replacement surgery is likely his best treatment for more major surgery.

[R. 1-3 at 13 (emphasis added)]

Subsequently, Livingston has seen multiple medical providers both at BCC and at KDOC's medical facility, Kentucky State Reformatory.  All of these medical providers concluded that conservative management of Livingston's condition was appropriate at the time.  Additionally, a committee of all of the KDOC's medical providers considered his case; their consensus opinion was that conservative management was appropriate.  [R. 25-1]

The KDOC's medical staff has continued to monitor Livingston's progress to determine if there has been sufficient improvement in his condition to make him a viable candidate for knee replacement surgery.  On June 26, 2012, Dr. Whayne, a cardiologist at the University of Kentucky Cardiology Clinic examined Livingston and recommended that he undergo tests to determine whether he might be healthy enough to have this surgery.  *Id.*  Based on the report of Dr. Whanye's examination, Dr. Doug Crall, KDOC Medical Director, advises that Livingston will be scheduled to see an orthopedic surgeon for re-evaluation of his knees.  Dr. Crall estimated that it would take six to eight weeks to schedule that appointment with a specialist for Livingston.  [R. 25-1 at 1]  The next step in Livingston's medical care will depend upon the surgeon's recommendations.  *Id.*

The foregoing history of Livingston's medical treatment fails to establish that prison staff acted with "deliberate indifference" to his serious medical needs.  It is well-established that a prisoner cannot show deliberate indifference where he or she is being provided with medical

6

treatment, but the prisoner disagrees with a doctor's reasonable medical judgment regarding the most appropriate course of treatment: a mere difference of opinion concerning the best treatment plan does not indicate deliberate indifference. *Sharpe v. Patton*, No. 08-cv-58-HRW, 2010 WL 227702, at *10 (E.D. Ky. Jan. 19, 2010). Here, Livingston has a difference of opinion with his medical care providers as to what his course of treatment should be. In the past few years, the general consensus of his examining physicians, particularly from the specialists such as Dr. Kilambi, is that Livingston is a high-risk patient for knee replacement surgery and any other invasive procedure. In 2009, Dr. Kilambi opined that such surgery could be fatal for Livingston. Although in 2010, Dr. Kevin Pearce, a family practice physician, did recommend knee replacement surgery, his opinion was the exception, and he is not a cardiology specialist. At this juncture, it is unclear whether Livingston may have since become a viable candidate for knee replacement surgery. The KDOC has taken and is currently taking steps to make that determination.

While Livingston disagrees with the course of medical treatment he has received from medical staff at the KDOC, a prisoner's mere disagreement with a diagnosis or treatment is not actionable under 42 U.S.C. §1983, as it cannot establish that the defendant is deliberately indifferent to his medical needs or condition. *Kimble v. Kukua*, No. 3:05-cv-00310, 2008 WL 4443248, at *8 (S.D. Tex. Sept. 25, 2008); *Rodriguez v. Lappin*, No. 08-347-GFVT, 2009 WL 2969510, at *6 (E.D. Ky. 2009); *Greer v. Daley*, No. 01-C-586-C, 2001 WL 34377922, at *3 (W.D. Wis. Dec. 27, 2001). As the Court has explained,

> . . . While it appears that the plaintiff has not gotten what he wants, what he wants is not the issue. Ordering a specific type of surgery is not the appropriate function of this Court ... at most the plaintiff has alleged a difference in opinion between the plaintiff and his health care providers regarding the expediency of a specific treatment. This does not generally create a constitutional claim.

*Alexander v. Federal Bureau of Prisons*, 227 F. Supp. 2d 657, 666 (E.D. Ky. 2002).

Because Livingston's allegations and the medical records he has provided do not support the notion that prison medical staff are ignoring his medical conditions, but rather are treating them in a manner consistent with the recommendations of the specialists to whom he has been referred, he has failed to state a viable claim under the Eighth Amendment. Accordingly, those claims will be dismissed, and his corresponding requests for injunctive relief will be denied.

## II

Livingston also alleges that after he filed this action in December 2011, prison staff retaliated against him by filing several baseless disciplinary reports against him. Specifically, he points to the following disciplinary reports:

a. On February 29, 2012, just before his 8:00 a.m. dental appointment, Livingston cancelled his appointment stating that he felt sick. On March 3, 2012, Dental Assistant Heather Stovall issued a disciplinary report against Livingston, stating her belief that Livingston had cancelled the appointment because he had not been taking required medication before the appointment. On March 8, 2012, Correctional Officer Betty J. Sorenson dismissed the disciplinary report following an investigation.

b. On March 14, 2012, during his rescheduled dental appointment, Livingston refused treatment because he had been taking blood thinning medication. Stovall reported that upon checking with the medical department, she was advised that Livingston had not been told to take the blood thinning medication. Stovall charged Livingston with being non-compliant with taking his medication. On March 20, 2012, staff dismissed the charge on the ground that inmates have the right to refuse medical treatment.

c. On April 12, 2012, Deputy Warden Brandy Harm charged Livingston with obtaining goods or services under false pretenses. The charge was predicated upon Livingston's failure to obtain prior permission to use a library computer to write a letter unrelated to legal work, namely to request the warden's permission to send his watch back to the manufacturer for repair. Livingston was found guilty of this offense, reprimanded, and ordered to perform 40 hours of extra duty.

Livingston contends that these disciplinary reports were issued against him in retaliation for filing this action. However, the defendant was not served in this case until April 25, 2012, [R. 12] well after all three of these disciplinary reports were issued. Absent the defendant's knowledge of the case prior to the issuance of the disciplinary reports, Livingston cannot establish a causal connection between the two, rendering the claim without merit. *Cf. Moorer v. Booker*, No. 09-13725, 2010 WL 5090111, at *5 (E.D. Mich. Aug. 31, 2010).

## III

On July 5, 2012, Livingston filed a "Memorandum of New Evidence." [R. 24] In it, he alleges that when BCC dismissed certain disciplinary reports against him, the warden failed to comply with K.R.S. 196.180, which he contends requires that any reference to these disciplinary reports be expunged from his inmate records. Whatever the merits of these new claims, they are factually and legally distinct from his claims regarding the sufficiency of his medical care, and they arise under state, rather than federal law. Because his federal claims will be dismissed, the Court declines to exercise supplemental jurisdiction over them. 28 U.S.C. § 1367(c); *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).

Accordingly, **IT IS ORDERED** that:

1       Plaintiff's motions for a protective order and a temporary protective order/injunctive relief [R. 7, 10] are **DENIED**.

2.      Plaintiff's "Motion to Convert to Civil Action" [R. 13] is **DENIED**.

3.      Defendant Don Bottom's motion to dismiss the complaint [R. 16] is **GRANTED**.

4.      Plaintiff's "Motion for Emergency Hearing/Memorandum of New Evidence" [R. 24] is **DENIED WITHOUT PREJUDICE**.

9

5.      Plaintiff's motion for summary judgment [R. 26] is **DENIED**.

6.      The Court will enter an appropriate judgment.

7.      This matter is **STRICKEN** from the docket.

This the 21st day of August, 2012.



Signed By:

_Joseph M. Hood_

Senior U.S. District Judge